UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MORRIS AKERMAN, et al.,

                         Plaintiffs,

                                                    **MEMORANDUM & ORDER**

        -against-                                   07 CV 1838 (RJD)(VVP)

AROTECH CORPORATION, et al.,

                         Defendants.
-----------------------------------------------------------X
DEARIE, Chief Judge.

        Plaintiffs bring this securities fraud action on behalf of themselves and others who

purchased common stock of defendant Arotech Corporation ("Arotech" or "the Company")

between November 9, 2004 and November 15, 2005 (the "Class Period"). Count I of the

consolidated class action complaint alleges that Arotech and three of its officers violated section

10(b)of the Securities Exchange Act of 1934 (the Exchange Act or the Act) and Rule 10b-5 by

making false statements in, and withholding material facts from, the Company's financial

statements and press releases that had the effect of hiding from investors the magnitude of the

financial decline occurring within one of the Company's sizeable, newly acquired subsidiaries.

Count II seeks to hold individual officers liable as controlling persons within Section 20(a) of the

Act.

        Defendants move to dismiss both counts pursuant to Fed. R. Civ. P. 12(b)(6), principally

on the grounds of materiality, scienter and particularity.

        For the reasons that follow, defendants' motion is denied.

# FACTS[1]

## A.    Arotech and Its Acquisition of Armour of America

Arotech describes itself to investors as "a defense and security products and services company engaged in three principal business areas: high-level armoring for military, paramilitary and commercial air and ground vehicles; interactive simulation for military, law enforcement and commercial markets; and batteries and charging systems for the military." 2004 Annual Report on SEC Form 10K for the Year Ended December 31, 2004, dated March 31, 2005 ("2004 10K") at 2; Compl. ¶¶ 3, 16.[2]  Plaintiffs allege that Arotech "presented itself as a company that was adept at managing and integrating acquired assets." Compl. ¶ 3.  In its SEC filings, Arotech reports that the Company "operate[s] primarily as a holding company, through [its] various subsidiaries," which are "organized into three divisions." 2004 10K at 2.  At the end of fiscal 2004, the Company wholly-owned six subsidiaries (four American, two Israeli) and held partial interests into two other foreign concerns.  2004 10K at 2.

The subsidiary at issue here is one of the wholly-owned American subsidiaries,  Armour of America ("AofA"), a company specializing in body and vehicle armor, which Arotech acquired in August 2004. Compl. ¶ 3; 2004 10K at F-19 (acquisition occurred in August 2004). Arotech first reported the acquisition in its 2004 10K, where it disclosed the purchase of all of the outstanding shares of AofA for a base price of $19 million in cash, "with additional possible

_____

[1] The facts are as alleged in the complaint.  See *infra* at pp. 12-13.

[2] For purposes of deciding a motion to dismiss, the Court may consider written instruments incorporated into the pleading including, in the securities fraud context, SEC filings and other publicly available documents that plaintiff possessed or relied upon in filing suit. Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Fisher v. Kansas, 467 F. Supp. 2d 275, 279-80 (E.D.N.Y. 2006).

earn-outs if AofA is awarded certain material contracts." 2004 10K at F-19. An additional three million dollars "was to be paid into an escrow account" to secure a portion of this earn-out consideration, with the purchase agreement establishing $40 million as the maximum total purchase price including the earn-out consideration. Id.

The Company accounted for the transaction using the "purchase method," and therefore allocated the purchase price to the assets acquired and liabilities assumed based upon their fair values on the date of acquisition. Id. The allocation included approximately $6 million for AofA's tangible assets and $10.5 million for goodwill.[3] Id. The Company advised investors that, in accordance with the Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets," goodwill arising from its acquisition of AofA would not be amortized. Arotech alerted investors, however, to its obligation under SFAS 142 to "perform an annual impairment test" and, if the test showed an impairment, the Company's ensuing obligation to "record the impairment charge in its statement of operations." Id. Arotech further represented that it "will [sic] also assess the impairment of goodwill whenever events or changes in circumstances indicate that the carrying value many not be recoverable." Id.

AofA was Arotech's third acquisition in 2004. In January of that year, the Company had purchased Epsilor Electronic Industries for $10 million (book value of $2.2 million and $5.2 million in goodwill) and FAAC Incorporated for $27 million (book value of $4.8 million and $18 million in goodwill). Id. at F-16, F-17.

The price Arotech paid for AofA exceeded Arotech's total revenues from continuing

---

[3] Goodwill, of course, is by definition the amount by which the purchase price exceeds the net assets of a company, and is first accounted for when a company is acquired.

operations for the previous year, 2003, which totaled $17.3 million. Id. at 52. For the year ended 2004, Arotech's revenues increased by $32.6 million, or 188%, to $50.4 million. Id. The Company attributed the increase "primarily" to two factors: increased revenues from vehicle armoring, and revenues generated by Armor of America and its two other 2004 acquisitions. Id.[4] Still, Arotech incurred a "significant" operating loss of $9 million in 2004. Id. at 46. The Company flagged this figure as reflective of a steady reduction in net losses as compared to the previous two years, when net losses were $18.5 million (for the year ending December 31, 2003) and $9.2 million (for 2002). Id. The Company represented that "[t]his was achieved through a combination of cost-cutting measures and increased revenues, particularly from," *inter alia*, "sales of products manufactured by the subsidiaries we acquired in 2002 and 2004." Id.

## B. The Government's "Termination for Default" of a Contract with Armour of America

According to AofA employees identified in the complaint as variously numbered "Confidential Witnesses" ("CW1," "CW2" and so forth), Arotech's pre-acquisition due diligence did not reveal all material information about AofA before the acquisition. Compl. ¶ 33-34.[5] In particular, sometime in August 2004, "near when" Arotech acquired AofA, the federal

_____

[4] Within its armoring division, Arotech reported revenues for 2004 of $18 million, which represented an increase of $14.6 million, or 424%, for that division over 2003, and was "due primarily to increased revenues from vehicle armoring and to the added revenues from aircraft armoring since [the Company] acquired [Armor of America]." 2004 10K at 52.

[5] The Court may consider these allegations. Novak v. Kasaks, 216 F.3d 300, 313-314 (2d Cir.) ("our reading of the PSLRA rejects any notion that confidential sources must be named as a general matter . . . where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendant' statements were false"), cert. denied, 531 U.S. 1012 (2000).

government cancelled a contract with AofA that had called for AofA to armor approximately 20 CH-47 helicopters. Compl. ¶ 34. Known in the industry as a "T4D," or "termination for default," the government's decision reflected its belief that AofA had misrepresented its armor's weight and capacity to withstand armor-piercing ammunition. Id. In subsequent efforts to secure new government contracts, AofA would have to disclose the T4D; the revelation would limit the potential success of those efforts. Id. [6]

According to CW1, CW2 and other AofA employees, AofA did in fact experience the expected difficulty resulting from the T4D; it lost, *inter alia*, millions of dollars worth of contracts for the armoring of helicopters. Id. at ¶¶ 33-37. The T4D and other problems combined to cause a downward "domino effect" within AofA.[7] For example, the result of lost orders was that certain time-sensitive products kept on hand to service orders went unused, yet alternatives to that product could not be acquired because AofA contracts, bearing the stigma of the T4D, did not enjoy a sufficiently high priority. Id.. "Obsolete" and "unsalable" AofA stock accumulated and was inventoried improperly. Id. at ¶ 39.

## C.    The Defendants' Knowledge of AofA's Condition

Throughout the Class Period, individual defendant Robert S. Ehrlich was Arotech's President and CEO, defendant Steven Esses was the company's COO, and defendant Avihai Shen was CFO and Vice President of Financial Affairs. Compl. ¶¶ 17-19. The complaint alleges

---

[6] See generally, "Termination for Default," *64 Am.Jur.2d,* Public Works and Contracts §135 (2008), and authorities cited therein.

[7] A second concern with AofA's financial condition was that it did not have the backlog of customer orders that it had represented to Arotech. Id. at ¶ 34.

in general language that Erhlich, Esses and Shen, by virtue of their positions in the Company, each had access to the adverse information about AofA that was undisclosed; each exercised control over the content of the SEC filings, press releases and other public statements in which the alleged misrepresentations and omissions were made; each also signed the pertinent SEC filings, Compl. ¶¶ 17-22, 23-25, 40-42, attesting that the information contained in those documents "fairly present[ed], in all material respects, the consolidated financial condition of the Company and its subsidiaries." Id. ¶¶ 47, 53, 58. The complaint also alleges that Esses met with AofA's Chief Operating Officer John Nehmens and other senior management of AofA during the relevant period "both in person and via teleconference, regarding how to adjust operations due to the T4D and the difficulty it created in obtaining future contracts because of the need to explain the default." Id. ¶ 35. AofA's monthly sales projection reports were sent to Ehrlich and its monthly inventory reports were distributed to Ehrlich, Esses and Shen. Id. ¶¶ 40-41. Having access to AofA's accounting software, members of Arotech senior management could also run their own reports regarding AofA's inventory and sales. Id. ¶ 42.

**D.    The Sequence of Disclosures Concerning Arotech and AofA**

The acquisition of AofA occurred during Arotech's fiscal third quarter, which ended September 30, 2004. See Compl. ¶ 43. In the press release announcing reports for the third quarter and nine-month period ending September 30, 2004, published on November 9, 2004 ("2004 3Q Release"), Arotech did not disclose the T4D. Id. ¶¶ 43, 48. This release reported, *inter alia*, that revenues for the quarter had reached $16.3 million, an increase of more than 185% over the corresponding period in 2003; that this was Arotech's "best quarter ever," and that this

"record achievement" was the result of "several strategic steps" the company had undertaken. Id., ¶ 43. The release remarked that the company "ha[d] added several excellent companies to [its] portfolio," and that "these companies are contributing to our growth and expanding our customer base." Id.

Arotech's first apparent disclosure concerning AofA's loss of a government contract is found in the 2004 10K issued on March 31, 2005, approximately seven months after the acquisition and the T4D.[8] In the "Legal Proceedings" section of the 10K, Arotech announced the following:

> In December 2004, AofA filed an action in the United States District Court of Federal Claims against the United States Naval Air Systems Command (NAVAIR) seeking approximately $2.2 million in damages for NAVAIR's alleged improper termination of a contract for the design, test and manufacture of a lightweight armor replacement system for the United States Marine Corp CH-46E rotor helicopter. NAVAIR, in its answer, counterclaimed for approximately $2.1 million in alleged reprocurement and administrative costs.

2004 10K at 33.

In the "Risk Factors" section of that 10K, Arotech disclosed the following: "Our government contracts may be terminated at any time and may contain other unfavorable provisions." Id. at 63. The statement further explained:

> The U.S. government typically can terminate or modify any of its contracts

---

[8] Precisely how contemporaneous the T4D was with Arotech's acquisition of AofA is not definitely pleaded. See Compl.¶¶ 33-34 (the T4D occurred sometime in August 2004, the same month as the acquisition, "near when" the acquisition was consummated); 2004 10K at F-19 (Arotech purchased AofA "[i]in August 2004"). At least one fair reading is that the T4D actually did precede the acquisition. See Compl. ¶ 33 (alleging that Arotech's due diligence was inadequate in this respect); cf. Oral Arg. Tr. at 4 (defendants' counsel remarking that, "[i]ndeed, as [plaintiffs'] counsel said, the termination took place before the acquisition"). This minor ambiguity is not material to the analysis. See infra at pp. 17 et seq.

with us either for its convenience or if we default by failing to perform under the terms of the applicable contract. *A termination arising out of our default could expose us to liability and have a material adverse effect on our ability to re-compete for future contracts and orders.* Our U.S. government contracts contain provisions that allow the U.S. government to unilaterally suspend us from receiving new contracts pending resolution of alleged violations of procurement laws or regulations . . ..

Id. (emphasis added).

Significantly, the 2004 10K did not disclose that the government's termination of a contract with AofA seven months earlier was a termination for default.

Other "risk factors" that Arotech did disclose in the 2004 10K include the fact that the Company "ha[s] had a history of losses and may incur future losses" and the risk that "[t]here can be no assurance that we will ever be able to achieve or maintain profitability consistently or that our business will continue to exist." Id. at 59. Arotech also disclosed in this 10K that the Company "may not be successful in operating new businesses" and that its "acquisition strategy involves various risks." Id. The Company warned that its new acquisitions engaged in "relatively new areas of business for [the Company]," that "[its] management group has limited experience operating these types of businesses," and that "[i]f [the Company is] unable to successfully operate these new businesses, [its] business, financial condition and results of operations could be materially impaired." Id. at 61. The 2004 10K further disclosed that "[p]art of [Arotech's] strategy is to grow through the acquisition of companies that will complement our existing operations or provide us with an entry into markets we do not currently serve," but that "[g]rowth through acquisitions involves substantial risks, including the risk of improper valuation of the acquired business and the risk of inadequate integration." Id.

In a release issued the same day the 2004 10K was filed, Arotech reported to investors

-8-

that it had posted "record results" for the fourth quarter and full year 2004. Id. ¶ 44. This release also reported that the company was "growing" in part "through strategic acquisitions," that "[t]he subsidiaries that [the company] acquired in 2004 are not fully integrated into the Company," and that the Company had "begun to benefit from the synergies of [its] entire portfolio of companies." Id.

Following the 2004 10K, Arotech's next round of public statements came in a press release on May 11, 2005 and its Form 10Q for fiscal 2005's first quarter, ending March 31, 2005, issued on May 16, 2005. Compl. ¶ 49-53. Neither of these documents disclosed the existence of the T4D nor concern on the part of Arotech management with the performance of AofA. Id. ¶¶ 48, 54. The press release also reported, *inter alia*, a 45% increase in revenues for the quarter and projected that second quarter revenues would increase by more than 30% over the second quarter of 2004. Id.

The first adverse news concerning AofA's financial condition came in Arotech's *next* quarterly report—for fiscal 2005's second quarter, ending June 30, 2005—issued on August 15, 2005 (the "August 2005 10Q") and the press release of the same day. In those documents, Arotech headlined the Company's new armoring orders and its 23% revenue increase for the second quarter 2005, Compl. ¶¶ 55, 56, but also reported that "[t]his strong demand was somewhat offset by the performance of our Armour of America, AofA, subsidiary, which was below our expectations. As a result, we wrote down approximately $2.4 million in impairment charges." Id. ¶ 56. The release also stated that Arotech was "disappointed with AofA's progress," that management "believe[d] that there are significant opportunities to be achieved under the right focus," and the Company had "therefore" recently hired a new president of the

-9-

armor division, who would "focus special attention on improving AofA." Id. ¶¶ 56-57. These

documents also contained optimistic projections for "substantial growth" for the full year 2005,

and, despite reporting an impairment, did not disclose the T4D. Id. Plaintiffs also allege that the

impairment write-down and other Arotech statements concerning AofA downplayed the true

magnitude of AofA's decline. Id. ¶ 59, 48.

Approximately two months later, on September 30, 2005, Arotech issued a press release

(the "September 2005 Release") in which it disclosed that it had secured at least $17.5 million in

"Convertible Debt Financing." Id. ¶ 59. The news was part of the Company's announcement

that it was "revamp[ing] operations" in order to "[f]ocus on [o]rganic [g]rowth," and "vigorously

cutting costs as part of its strategy to achieve and maintain net profitability." Id. The release

disclosed that the Company's "main disappointment has been AofA, which has not performed as

expected and has instead been a significant drag on earnings," but that the new financing "will

enable [the Company] to restore the cash invested in AofA and focus on enhancing the

performance of our existing AofA product lines." Id. ¶ 60.

The final set of disclosures issued during the Class Period came on November 14, 2005,

when Arotech released its third quarter results. In the press release and third quarter 10Q,

Arotech announced the following:

> Arotech's results for the third quarter include a charge to operating income
> of $8.7 million for the impairment of goodwill and other intangible assets,
> reflecting a reevaluation of Armour of America's (AofA's) value resulting from
> its disappointing performance to date.

Id. ¶ 62. The Company further reported that it had suffered a decline in revenues of $5 million

compared to the same period in 2004 (from $16.3 to $11.2 million) and a net operating loss of

$12 million (compared to a break-even recorded for the same period in 2004), and declared these figures to be "largely attributable to the under performance of the Company's Armor Division." Id. The announcements included the news that the president of the Armor Division whose appointment had been announced only three months earlier (in the August 15, 2005 press release) had resigned. Id. ¶ 63.

### E.    The Price of Arotech

Shares of Arotech traded on the NASDAQ National Market Exchange at $25.20 on November 9, 2004, the commencement of the Class Period, and closed at $6.61 on November 15, 2005, the day after the impairment was reported. Compl. ¶¶ 6, 65.[9]  Plaintiffs draw the Court's attention in particular to the single day decline on November 15, 2005, from $8.40 to $6.61 per share (a drop of 27%), in response to the news of the $8.7 million impairment and disturbing news of AofA's difficulties.  Plaintiffs claim that this was the first time the Company came clean about the true condition of AofA and Arotech and, therefore, that the November 15 market response was  first "true" operation of the market in Arotech shares; i.e., the news caused such a sizeable drop because it was materially worse than the market had been led to believe based on Arotech's disclosures to date.  From the commencement of the Class Period until the true state of affairs was revealed, plaintiffs contend, the market prices of Arotech's shares were inflated, and they, as owners of those shares, suffered economic loss.

---

[9] All references to Arotech share prices during the Class Period have been adjusted to reflect the Company's 1:14 stock split on June 21, 2006.  Compl. ¶6 n.1.

**DISCUSSION**

## I.    LEGAL STANDARDS

### A.    Securities Fraud Generally

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." Id. SEC Rule 10b-5, which implements the statute, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."17 C.F.R. § 240.10b-5(b).

To state a claim for violation of these provisions, plaintiffs "must establish that 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff[s'] reliance on the defendant's action caused injury to the plaintiff[s].'" ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 193, 197 (2d Cir. 2009) (internal citation omitted).

Securities fraud plaintiffs must also meet the "heightened pleading requirements" of Rule 9(b) of the Federal Rules of Civil Procedure. ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The rule requires that "the circumstances constituting fraud . . . be stated with particularity." Fed.R.Civ.P. 9(b). In a "misstatements" case, the securities fraud plaintiff must therefore "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI, 493 F.3d at 99. For particularity purposes, allegations that

-12-

are deemed "conclusory" or "unsupported by factual assertions" are insufficient. Id.

### B. Motions to Dismiss Securities Actions

Despite the several "heightened" pleading requirements imposed on securities fraud plaintiffs, their allegations are still accepted as true at the 12(b)(6) stage. See Tellabs, Inc. v. Makor Issues & Rights, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) ("faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"). Accord, JP Morgan Chase Co., 553 F.3d at 193, 196. On a motion to dismiss a securities fraud complaint, the Court must likewise draw all reasonable inferences in the plaintiffs' favor. ATSI, 493 F.3d at 97. Finally, the "plausibility" standard of Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), developed in the antitrust context, is also applicable to securities fraud pleadings. ATSI, 493 F.3d at 98 (to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'") (quoting Twombly, 127 S. Ct. at 1965).

### C. Scienter

To avoid dismissal at the 12(b)(6) stage, plaintiffs must satisfy the requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA) for the pleading of scienter. 15 U.S.C. ¶ 78u-4(b)(3)(A);  JP Morgan Chase, 553 F.3d at 198; ATSI, 493 F.3d at 99. The PLSRA requires plaintiffs to plead "with particularity facts giving rise to a *strong* inference that the defendant acted with the *requisite state of mind.*" 15 U.S.C. §78u-4(b)(2) (emphases added).

-13-

*i.* *"Requisite State of Mind"*

The "requisite state of mind" in 10b-5 claims is "'intent to deceive, manipulate, or defraud,'" Tellabs, 127 S. Ct. at 2504 (*quoting* Ernst & Ernst v. Hochfelder, 425 U.S. 184, 194 n.12 (1976)). "Recklessness" also suffices. JP Morgan Chase, 553 F.3d at 198. To plead the required mental state, plaintiffs must allege facts "to show either (1) that defendants had the motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior or recklessness." Id. Thus,"'[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'" Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation omitted).

The "motive and opportunity to defraud" prong requires a showing that defendants "benefitted in some concrete and personal way from the purported fraud." Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir.), cert. denied, 531 U.S. 1012 (2000). The motives "that are common to most corporate  officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," do not establish the requisite scienter. Id. Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit. Id.

Alternatively, to adequately plead "recklessness" under the "strong circumstantial evidence" prong,  plaintiffs must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. Further, "[w]here plaintiffs contend [that] defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309 (internal citation omitted).

-14-

Accord JP Morgan Chase, 553 F.3d at 198 (under the alternative "strong circumstantial evidence" prong, circumstances that "may give rise to a strong inference of the requisite scienter" include allegations that defendants "engaged in deliberately illegal behavior," or "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information that they had a duty to monitor") (internal citation omitted).

      *ii.*     *"Strong Inference"*

To be a "strong" for PLSRA purposes, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc, 127 S. Ct. at 2504-05. This is an inherently comparative evaluation requiring the Court to "take into account plausible opposing inferences." Id., 127 S. Ct. at 2509. To perform this assessment, the Court "must consider the complaint in its entirety." Id. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (emphasis in original). The Court also made clear that "the inferences that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. at 2510 (internal citations omitted). Summarizing its holding, the Court in Tellabs explained:

> We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically . . . . In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

Id. at 2511 (internal citations omitted).

When the competing inferences rest in equipoise, the "tie . . . goes to the plaintiff." City

of Brockton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (internal

citation omitted).


**D.    Materiality**

Whether a statement or omission is material turns on whether "there is a substantial

likelihood" that (1) "a reasonable shareholder would consider it important in deciding how to

[act]," or (2) "the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information available." TCS Indus.,

Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (*quoted in* JP Morgan Chase, 553 F.3d at 197).

Materiality, therefore, "necessarily depends on all relevant circumstances." JP Morgan Chase,

553 F.3d at 197.  In addition,

> [b]ecause materiality is a mixed question of law and fact, in the
> context of a [Rule] 12(b)(6) motion, a complaint may not properly
> be dismissed . . . on the ground that the alleged misstatements or
> omissions are not material unless they are so obviously
> unimportant to a reasonable investor that reasonable minds could
> not differ on the question of their importance.

Id. (internal citations and quotation marks omitted).

The Second Circuit in JP Morgan Chase also reaffirmed that SEC Staff Accounting

Bulletin No. 99, 64 Fed. Reg. 45150-52 (the Bulletin, or SAB 99), is "persuasive authority" on

materiality.  Id., 553 at 198.  In the Bulletin, the SEC urges that both quantitative and qualitative

factors be considered in assessing a statement's or omission's materiality, and in the Circuit's

view, courts "[should] consider the factors it sets forth in determining whether [a] misstatement

significantly altered the 'total mix' of information available to investors." 553 F.3d at 198.

Under SAB 99, the "financial magnitude" of a statement or omission is an important factor, but "qualitative materiality" should also be considered. Id. The non-exhaustive list of factors the SEC considers, as summarized by the Circuit, include the "significance of the misstatement in relation to the company's operations" and "management's expectation that the misstatement will result in a significant market reaction." Id. Other SAB 99 factors include: (i) "whether the misstatement masks a change in earnings or other trends;" (ii) "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability;" and (iii) management's expectations about the impact that a misrepresentation will have on price." SAB 99, 64 Fed. Reg. 45150 at 45152. In short, "[t]hese qualitative factors are intended to allow for a finding of materiality if the quantitative size of the misstatement is small, but the effect of the misstatement is large." JP Morgan Chase, 553 F.3d at 205.


## II.    APPLICATION OF LAW TO PLAINTIFFS' ALLEGATIONS

In light of the foregoing standards, the Court concludes that plaintiffs' complaint survives the 12(b)(6) challenge.

### A.    Materiality and the Essence of Plaintiffs' Theory

As the Court understands it, the gravamen of plaintiffs' claim, which emerged in its most succinct iteration in plaintiffs' supplemental (and final) written submission and at oral argument, see Oral Arg. Tr. at 4 et seq., is that defendants never disclosed the T4D. Their theory, in substance, is that the T4D, even if not immediately catastrophic, was a significantly adverse

event that would inevitably all but destroy AofA's ability to procure future contracts. Because this effect, though long-term, was inevitable, the fact of the T4D should have been disclosed promptly. Instead, because Arotech management found itself embarrassed by the discovery that a company it had just gambled a year's worth of the company's revenues acquiring bore this stigma and would be a a serious liability, the Company tried to say as little about the event as possible for as long as possible. In furtherance of this "scheme," defendants released some accurate numbers, emphasized the most optimistic aspects of the acquisition, made some disclosures of negative information that were either untimely—or, if not untrue per se, not the whole of the story—all the while withholding news of the T4D, the one fact that would have cast the light of true accuracy on all the other disclosures. (For ease of discussion, we refer to this theory as the T4D theory, as distinguished from the accounting-based "Impairment theory" that received far more play in the text of the pleading and the briefs, and addressed *infra* at pp. 26 *et seq.*).

To reiterate the obvious, we are only at the 12(b)(6) stage, and this may not be what actually occurred, but it the story told by plaintiffs' allegations and the reasonable inferences we are required to draw in their favor, and must be assumed to be true for purposes of deciding whether to allow the claim to proceed.

The critical determination here is materiality: even before considering the scienter requirement, the T4D theory of fraud can only be found actionable if this single detail—the fact the termination, which *was* disclosed, was "for default"—is material. Under the standards set forth above, the Court readily concludes that the nature of the termination was material.

The Company itself chose to characterize terminations for default of government

-18-

contracts as having a "material adverse effect on [its] ability to recompete for future contracts and orders" and admitted that such terminations could "expose [the Company] to liability." But even if the Company had not used the talismanic word "material," there is little room for genuine argument here. "Assuming" for 12(b)(6) purposes that a T4D has the effects the complaint alleges and that defendants own public statement concedes, the occurrence of a T4D is certainly a fact that a "reasonable shareholder would consider important" in deciding how to act. TCS Industries, 426 U.S. at 449, and therefore "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." Id.

Numerous other allegations bolster this conclusion and ground the Court's finding of materiality on both quantitative and qualitative grounds under JP Morgan Chase. Among other things, (1) Arotech, as a holding company, essentially *is* its subsidiaries, (2) AofA was one of three companies acquired in 2004 and represented to investors as part of a "stateg[y]" of turning the Company around; (3) AoA represented a major investment of Arotech funds, with the purchase price exceeding the Company's entire prior year revenues; and (4) a component of the purchase price was additional consideration contingent on the very subject hampered by the T4D, namely, the likelihood of AoA being "awarded certain material contracts" in the future. 2004 10K at F-10. Particularly where the claim is fraud by omission, we cannot conclude that the T4D was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance," JP Morgan Chase, 553 F.3d at 197, and thus resolve materiality for 12(b)(6) purposes in plaintiffs' favor.

**B.    Scienter**

*1.    The Theory of the Fraud: Competing Inferences*

Given (i) the clear directive of <u>Tellabs</u> to consider "*all* of the facts alleged, taken collectively" and "holistically," 127 S. Ct. at 2509, 2511, (emphasis in original), (ii) the traditional practice at this stage of drawing all reasonable inferences in plaintiffs' favor, <u>ATSI</u>, 493 F.3d at 97, and (iii) the Supreme Court's recognition that a "strong" inference for <u>Tellabs</u> purposes need not be "irrefutable," absolutely the "*most* plausible," or "of the 'smoking-gun' genre," 127 S. Ct. at 2510-11, the Court concludes that the T4D theory states an actionable claim of securities fraud as "cogent" for <u>Tellabs</u> purposes as any competing theory defendants have proffered to explain the sequence of financial events and public disclosures concerning AofA and Arotech during the Class Period.

What are defendants competing inferences?  Defendants' scienter argument is that they did not commit fraud because they did disclose the fact that government terminated a contract with AofA and they made several disclosures of adverse information about AofA throughout the period, notably, the $2.4 million write-down of goodwill on August 15, 2005, the announcement in September 2005 that AofA was a drag on earnings; and the $8.7 million write-down of goodwill on November 15, 2005.

The Court's ruling on the materiality of the T4D disposes of those arguments to the extent they rest on the fact that the termination (but not its default nature) was disclosed.  Still, defendants urge the court to declare their explanation for the movement of Arotech's market price during the Class Period to be more cogent than that offered by plaintiffs.  Defendants emphasize that, although the price of Arotech stock dropped 27% in the single day following the

announcement of the $8.4 million impairment, the stock actually declined a total of 67% over the course of the entire period; the single day decline on November 15, they argue, "simply followed a string of timely disclosures concerning the AofA acquisition as facts unfolded." Def. Mem. at 18. The first such disclosure, apparently, was the announcement in March 2005 that the government had terminated an AofA contract; the next was the $2.4 million write-down five months later (on August 15), followed a month later by the disclosure that AofA was a "drag on earnings." The Court notes as well that the 2004 10K did alert investors in fairly plain language that Arotech had a history of losses, might not be successful in operating new businesses, employed an acquisition strategy that itself involves risks and expanded the Company into fields in which it was relatively inexperienced, and was a party to contracts that the government had broad powers to terminate for a variety of reasons. See *supra* at pp. 8 *et seq*. For all these reasons, defendants urge that the stronger inference here is not fraud but the unimpaired operation of the market in response to corporate disclosures, and the coming to pass of a risk (the failure of a subsidiary) that investors were fully warned of.

The inferences pointing to a lack of fraud are not without force. But for plaintiffs to survive at this stage, their inferences need only be "at least as strong as," not stronger than, any competing inferences. Tellabs, 127 S. Ct. at 2511. The Court concludes that the inferences of fraud are no less cogent than the countervailing claims of defendants.

Indeed, given the Court's view of the materiality of the T4D, the scale of inferences here actually tips in plaintiffs' favor. The inescapable fact here is that in the same document in which Arotech told investors that the newly acquired AofA suffered the termination of a government contract, it also told investors that when such terminations are for "default" they are "material[ly]

-21-

adverse" events, but it withheld the fact that the disclosed termination was of this materially adverse type. Defendants do not offer a compelling explanation for this glaring omission. They insist that they were entitled to await the outcome of the litigation challenging the T4D before alarming investors about it, but this claim rings hollow in the face of the Company's own description to investors (in the 10K) of the alarming consequences of a T4D, which contains none of the litigation-related qualifiers proffered here. The compelling inference is that the Company's belief that it could withhold the information until the litigation resolved itself is a post-hoc explanation but not the real reason that Company withheld the alarming news of the T4D. Litigation, after all, could last for years, and if T4D's did not have any adverse effect on a company's ability to compete for future contracts until litigation challenging it was resolved, surely management's description of T4D's in the 10K would have included that important fact. Finally, the substantial lapse of time between the T4D and the 2004 10K, the substantial length and detail of the 2004 10K, and the obvious significance of a holding company's first introduction to investors of a newly acquired subsidiary, all further support the inference of a deliberate, considered, and knowing decision to withhold that crucial detail about AofA.

    2.    *Requisite State of Mind: "Motive and Opportunity to Defraud"*

    Having already found the inference of fraud "strong" for PLSRA and <u>Tellabs</u> purposes, the Court must nonetheless address whether plaintiffs had met the "requisite state of mind" requirement. Defendants argue that the critical allegation of a concrete, personal benefit required by <u>Novak</u>, 216 F.3d at 300, is lacking. Def. Mem. at 5, Def. Reply. Mem. at 11-12. The allegations of motive, as defendants read them, amount to assertions of generic corporate practice without a personal benefit or are of the tautological variety—i.e., that defendants committed

fraud and inflated Arotech's prices because they had a desire to commit fraud and to inflate Arotech's prices. The Court agrees with defendants on this point.

Two of the three alleged motives are purely tautological: namely, the alleged desire to "deceive the investing public" regarding the value of Arotech's common stock, and the desire to "cause" plaintiffs to purchase common-stock at artificially-inflated prices. Compl. ¶ 7. These are squarely inadequate under the "motive and opportunity to defraud" prong of JP Morgan Chase, 553 F.3d at 198 (motives that are "common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation" do not satisfy the scienter requirement). The remaining allegation of motive is that defendants acted from a desire to "arrange for financing upon preferred terms not otherwise available." Compl. ¶¶ 7, 85-86. This motive likewise fails to allege an actionable personal benefit, and falls within the category of shared, corporate objectives held to be insufficient to establish securities fraud scienter. See, e.g., San Leandro Emer. Med. Gr. Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 814 (2d Cir. 1996) ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud").

### 3. *"Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness"*

Alternatively, plaintiffs may seek to establish the requisite state of mind through a strong circumstantial showing of "recklessness" based on defendants alleged knowledge of and access to the adverse undisclosed information about AofA. See discussion *supra* at p. 14. Defendants, fusing the particularity and scienter pleading requirements, argue that plaintiffs have failed under even this alternative "recklessness" approach because they do not allege that each defendant

knew or had access to the facts that were contrary to their public statement or to identify *specific*

reports or statements containing the alleged contradictory facts. Def. Mem. at 24 *et seq.* It is

inadequate, they argue, to allege that, solely by virtue of their executive positions, defendants

"must have" or "should have" known of the facts about their company's finances alleged to be at

odds with their public disclosures, citing Novak, 216 F.3d at 309.

Given the critical importance of the scienter requirement at the 12(b)(6) stage, the Second

Circuit's elucidation in Novak of the relation between "recklessness" and "motive and intent to

defraud" is critical here because the parties arguments, and much of the cited caselaw, often blur

the distinction between these two alternative ways of establishing the requisite state of mind.

"Intentional misconduct," the Court explained, "is easily identified" because it involves

"deliberate illegal behavior" such as insider trading or the "knowing sale of a company's stock at

an unwarranted discount." Novak, 216 F.3d at 308. "Recklessness," however, "is harder to

identify with such precision and consistency." Id.. After reciting its own boilerplate definitions

(*e.g.,* conduct that is "highly unreasonable" and which represents "an extreme departure from the

standards of ordinary care" or a "danger" that was "either known to the defendant or so obvious

that the defendant must have been aware of it"), the Court conceded that its own "general

standards offer little insight into precisely what actions and behaviors constitute recklessness

sufficient for § 10(b) liability," id., and instead turned to "the actual facts of [its] securities fraud

cases" for "the most concrete guidance." Id. The Court drew upon two examples to show that

recklessness has been sufficiently stated for 12(b)(6) purposes "when [plaintiffs] have

specifically alleged defendants' knowledge of facts or access to information contradicting their

public statements." Id.. "Under such circumstances," the Court explained, "defendants knew *or,*

*more importantly, should have known* that they were misrepresenting material facts related to the corporation." Id. (internal citation omitted). These statements, and the facts of the two examples that the Novak Court highlights, rebut defendants' arguments and resolve the recklessness question here in plaintiffs' favor.

The first example is Cosmas v. Hassett, 886 F. 2d 8, 12 (2d Cir. 1989), in which "the pleading standard was met where the plaintiffs alleged that the defendants made or authorized statements that sales to China would be "an important new source of revenue" when they knew or should have known that Chinese import restrictions in place at the time would severely limit such sales." Novak, 216 F.3d at 308. The second example is Goldman v. Belden, 754 F.2d 1059, 1063, 1070 (2d Cir. 1985), where "the pleading standard was met where the plaintiffs alleged that the defendants released to the investing public several highly positive predictions about the marketing prospects of a computer system to record hotel guests' long-distance telephone calls when they knew or should have known several facts about the system and its consumers that revealed 'grave uncertainties and problems concerning future sales of' the system." Novak, 216 F.3d at 308.

Plaintiffs here allege no less: that defendants knew, at the time they released non-adverse, and affirmatively optimistic information about AofA, that the Company was saddled with a T4D that would damage its capacity to compete for new business. Defendants' argument that a "should have known" theory does not suffice is directly contrary to the quoted language from Novak. In any event, contrary to defendants' reading, the complaint does identify specific communications through which defendants acquired the relevant knowledge: *inter alia*, plaintiffs allege that (i) AofA's COO met with defendant Esses (Arotech's CEO) in person and by

telephone to discuss the difficulties created by the T4D throughout the period; (ii) all three individual defendants received AofA's monthly sales projection and monthly inventory reports; (iii) all three individual defendants had access to AofA's accounting software. Given what the Court has concluded with respect to materiality and the cogency of the inference of fraud, the "should have known" or "must have known" inferences are compelling. Even more pointedly, the fact that Arotech was litigating the government's termination of the AofA contract undermines the argument that management did not know that the termination was for default.

## C.    Particularity

The fact that plaintiffs could have pleaded the T4D theory more concisely and transparently is not a defect of *particularity* for 12(b)(6) purposes. To be sure, particularity does require that plaintiffs plead with specificity not only the what, where and when of each alleged fraudulent statement, but also the reason "why the statements were fraudulent." ATSU, 493 F.3d at 99. The fact that the T4D theory was articulated better at oral argument than in the pleading does not mean it is not *in* the pleading. Similarly, the fact that the Impairment theory appeared to predominate in the allegations and take center stage in the briefing does not foreclose a decision to allow this 10b-5 case to proceed on the T4D theory. See 17 C.F.R. §240.10b-5(b) (prohibiting the failure "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading").

Finally, the parties are not to regard today's decision as somehow an implied dismissal of the allegations presenting the Impairment Theory or a ruling on defendants' arguments on the subject. But the place of those allegations in the lawsuit that survives should be addressed.

In summary, the Impairment theory is that certain generally accepted accounting principles required defendants to make larger and/or earlier write-downs of AofA's goodwill. Compl. ¶¶ 46, 48, 77-84. In this regard, plaintiffs allege that defendants' assurance in the 2004 10K that they had performed their annual impairment check and that no impairment was required was misleading. They also rely on accounting principle requiring a reassessment of goodwill "whenever events or changes in circumstances indicate that the carrying value many not be recoverable, " and on defendants' representation that they "will" adhere to this principle. 2004 10K at F-16.

Defendants argue that a claim of untimely impairment is not actionable as a matter of law because whether and when to take an impairment charge are "nuanced issue[s] of judgement." Def. Mem. at 26. See, e.g., Power Tool Co. v. Comm'r Internal Revenue, 439 U.S. 522, 544 (1979) (generally accepted accounting principles "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management"). They also assert that the complaint fails to identify "on what basis" or "at what precise time" defendants were required to take earlier write-downs than the two they took in 2005, Def. Reply Mem. at 7, and that these are fatal pleading defects. Id.; Def. Mem. at 11-12.

Consistent with the Court's treatment of the scienter and materiality elements above, the allegations addressing the failure to take an impairment survive not because they may establish a violation of generally accepted accounting principles—a question the Court does not decide— but because they describe actions that furthered the alleged scheme to delay full disclosure of the

true state of affairs at AofA.[10]

## CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss the complaint is denied.


SO ORDERED.

Dated: Brooklyn, New York
March 30, 2009

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge

---

[10] As the oral argument revealed, defendants understand that the failure ever to disclose the T4D is the core of plaintiffs' claim.  See Oral Arg. Tr. at 4.  Indeed, defendants' efforts at casting plaintiffs' theory as non-actionable reveal that they do understand that the essence of the claim is not the accounting rules themselves but the way the delayed impairments and other omissions allegedly furthered the scheme of concealing the T4D. See, e.g., Tr. at 4 ("What they complain . . was not disclosed was a disclosure of a parade of horribles that *necessarily would flow from this particular termination* such that it would give rise to and constitute a need for an impairment charge"); id. (proposition is that defendants should have "immediately written off the goodwill as soon as they bought the subsidiary"); Def. Mem. at 5 (complaint alleges that defendants failed to "disclose that the fair value of the goodwill of the business they had just acquired was, from the start, somehow worth *less than half* the purchase price paid").