UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

In Re Arotech Corp. Securities
   Litigation

**MEMORANDUM & ORDER**

07-CV-1838 (RJD)(VVP)

------------------------------------------------------X

DEARIE, Chief Judge.

      Pursuant to Rule 23 of the Federal Rules of Civil Procedure plaintiffs seek (i) the Court's final approval of a class-wide settlement—essentially, the creation of a common fund of $2.9 million in exchange for dismissal of the action and release of the defendants—and the related plan for allocating those moneys, which the Court has already approved provisionally for notice purposes, see Preliminary Order for Notice and Hearing in Connection with Settlement Proceedings, entered Jan. 22, 2010 (the "Preliminary Approval Order), and (ii) the Court's "final" certification of the several provisional class-related findings that the Court made for settlement purposes, including the definition of the class, the naming of lead plaintiffs, the appointment of class counsel and other matters relating to the administration of class members' claims.

      The particulars of these matters are set forth in detail in the Preliminary Approval Order and exhibits filed therewith and are referenced here only as the discussion requires. Likewise, the facts giving rise to this litigation and the parties' positions on the issues are detailed in the Court's Memorandum and Order denying defendants' motion to dismiss the Consolidated Class Action Complaint, see Akerman v. Arotech, 608 F. Supp.2d 372 (E.D.N.Y. 2009), and referenced here only as needed.

      Also before the Court is the application of class counsel for an award of attorneys' fees of

$965,000.00—a figure just shy of 1/3 of the settlement fund—and $45,346.32 as reimbursement for expenses, plus interest, both to be disbursed from the gross settlement fund.

The traditionally configured adversary process having terminated well in advance of the present motions, it is of course no surprise that the parties essentially agree that Rule 23's requirements have been established.[1] But party consensus does not satisfy Rule 23 nor does it relieve the Court of its independent obligation to determine whether Rule 23's requirements—both for final class certification and for class-wide settlement—have been satisfied. See Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 52 (2d Cir. 2000).

Having completed that undertaking, the Court grants the parties motions and approves the settlement, in substance, as presented in the settlement papers, except on the subject of attorneys' fees, which the Court awards in the amount of $725,000, slightly less than counsel seek. The discussion in this Memorandum and Order largely supplanting the summary findings and extraneous language contained in the proposed "Order and Final Judgment" submitted by plaintiffs, the parties are hereby directed to submit a revised proposed judgment, vastly abridged, consistent herewith.

---

[1] Plaintiffs' counsel submitted comprehensive supporting papers, leaving no part of Rule 23 unbriefed and no fact without documentary or affidavit support, whereas defendants' counsel made no written submissions and disputed none of plaintiffs' Rule 23 assertions. Defendants' counsel appeared in person rather than telephonically at the Fairness Hearing held on May 6, 2010 only upon the Court's request, and their statement of their clients' position fills barely a page of the transcript: they believe plaintiffs would have had difficulty proving scienter and loss causation, two points plantiffs' already acknowledge in their briefs, but they also believe that, "given Arotech's geographic location [Israel] . . . [t]his case would have cost more [to litigate], quite frankly, than the $2.9 million that the parties settled for." Hearing Tr. at 4.

# DISCUSSION

## I. Class Notice

The Court confirms that the content and dissemination of the notice satisfy the requirements of Rule 23.

Subsection (e) of Rule 23, applicable specifically to class action *settlements*, requires that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e). Because 23(*e*)'s language is so general, it is common practice in this Circuit to look to the more particularized notice requirements of subsection (c), applicable to class actions generally. For the type of class plaintiffs propose, an opt-out class certified under Rule 23(*b*)(3), section (c)(2)(B) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. (c)(2)(B). In "plain, easily understood language," id., the notice must explain, *inter alia*, the nature of the action, the issues and claims involved, the right of the recipient to op-out (and the time and manner for doing so), and the binding effect of the judgment. See Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii)

Having carefully re-examined the 27-page Notice, complete with a clear table of contents, section summaries, model-of-clarity prose, and user-friendly captioning, as well as the affidavit of the Claims Administrator, see Exhibit B to the Joint Declaration of Plaintiffs' Co-Counsel dated April 30, 2010 (the "Joint Declaration") and Exhibits A and B thereto, the Court finds that the requirements of the rule have been more than satisfied. The Claims Administrator oversaw the dissemination of the Notice to more than 14,000 potential class members, both institutional

and individual owners of Arotech shares during the relevant period, identified through a thorough review of the available sources, including proxy contact lists, the records of the transfer agent, a directory of institutional investors, and brokerage databases. See Claims Adm. Aff. ¶¶ 2-8. The Notice was also published on the Administrator's internet website and on three separate occasions on *Business Wire*. See Id.. These notice procedures are comparable to those routinely found to satisfy the requirements of Rule 23 and, therefore, due process. See, e.g., In re Global Crossing Securities and ERISA Litigation, 225 F.R.D. 436, 449 (S.D.N.Y. 2004) (Lynch, J.) (collecting cases).

## II. Certification of the Proposed Class

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy [and] [i]f those criteria are met, the [Court] must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)." United States v. City of New York, 258 F.R.D. 47, 54 (E.D.N.Y. 2009) (Gaurafis, J.) (internal Second Circuit citations omitted).

The party seeking certification bears the burden, by a preponderance of the evidence, to establish that "each Rule 23 requirement has been met." Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202, 204 (2d Cir. 2008). The evidence may consist of affidavits, documents, or testimony." Id. at 204. With respect to the type of class under Rule 23(b), plaintiffs seek certification under (b)(3), which requires them to establish that: (1) common questions "predominate" over individual questions; and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

4

Courts have long recognized that Rule 23's requirements are to be liberally construed, see, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179 (2d Cir.1990), and that certification for "settlement-only" purposes is both appropriate, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619-22 (1997), and can eliminate some of Rule 23's more difficult practical questions. E.g., Amchem, 521 U.S. at 620 (district court "[c]onfronted with a request for settlement-only class certification . . . need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial") (internal citation omitted).

A. Numerosity

While joinder must be "impracticable," it need not be impossible, Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir.1993), and plaintiffs have amply demonstrated that the joinder of more than 14,000 individual and institutional shareholders of Arotech, located throughout the United States, would be impracticable. Cf. Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir.1995) (numerosity presumed at 40 members). Further, concerns about a greatly diminished class size as a result of massive opting-out are not present here, for the deadline to opt-out has passed and not one class member has made that election. In any event, the possibility of future opt-outs does not destroy numerosity at the time of certification. See Gortat v. Capala Bros., 2000010 WL 1423018, *3 (E.D.N.Y Apr. 9, 2010) (Glasser, J.).

B. Commonality and Typicality

Commonality under (a)(2) ("questions of law or fact common to the class") and typicality under (a)(3) ("claims or defenses of the representative parties are typical of the claims or defenses of the class") "tend to merge into one another." Marisol A. v. Guiliani, 126 F.3d 372,

5

376 (2d Cir.1997) (citing, *inter alia*, General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n. 13 (1982)). "The crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" Marisol, 126 F.3d at 376 (quoting Falcon, 457 U.S. at 157 n. 13). In the Second Circuit, both typicality and commonality are established when "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove [defendants'] liability." In re Flag Telecom Holdings, Ltd. Sec.Litig., 574 F.3d 29, 35 (2d Cir. 2009) (internal citation omitted).

Plaintiffs have established commonality and typicality: each potential class member, like each of the named representatives, is a purchaser of Arotech common stock during the class period, and each has the same core legal claim against defendants, namely, that the value of the shares they owned was artificially inflated as a result of public misrepresentations allegedly made by defendants about the financial condition of Arotech and one or more of its subsidiaries. See In re Oxford Health Plans, Inc., 191 F.R.D. 369, 374 (S.D.N.Y.2000) ("Where the facts as alleged show that Defendants' course of conduct concealed material information from the entire putative class, the commonality requirement is met"). That some purchasers are individuals while others are institutions, and that each purchaser's losses may be unique due to the quantity of shares owned and the time during the Class Period when they were acquired, these minor differences do not defeat commonality or typicality for Rule 23 purposes. See Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir.1993). When all class members' claims are based on "the same unlawful conduct," commonality and typicality exist "irrespective of minor variations in

6

the fact patterns underlying individual claims").

   C.   Adequacy

"The Court must evaluate adequacy of representation by considering (i) whether the class representatives' claims conflict with those of the class and (ii) whether class counsel is qualified, experienced, and generally able to conduct the litigation." In re Global Crossing, 225 F.R.D. at 453 (internal Second Circuit citations omitted). The "touchstone of the adequacy inquiry is whether the interests of the proposed representative conflict with those of the members of the class as a whole." United States v. City of New York, 258 F.R.D. at 63. See also Amchem Prods., 521 U.S. at 625-26 ("a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members") (internal citation omitted).

The Court concludes that adequacy has been established. Inasumch as all claims arise from the same alleged course of conduct by defendants and involve injury of the same general type (i.e, damage resulting from the purchase of Arotech shares at artificially inflated prices), the Court discerns no actual or potential conflict between the interests of the named representatives and those of the other members of the class. On the subject of counsel, the Court is confident in the quality of the representation—a team led by two firms with solid experience in the handling of securities class actions throughout the United States. See Exhibits C and D to Joint Declaration (resumes of Brower Piven and Stull, Stull & Brody). Further, despite theories or practical realities that may explain the limited incentive of any individual class member to speak up and object to the choice of counsel, the Court does take note that not one of the more than 14,000 recipients of the Notice has done so.

D.  The (b)(3) "opt-out" Class:
    <u>Predominance and Superiority</u>

Certification of a class under (b)(3) is appropriate if the Court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23 (b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," <u>Amchem Prods.</u>, 521 U.S. at 623, and "is a test regularly met in certain cases alleging . . . securities fraud." <u>Id.</u> at 625.

Predominance is established here largely for the reasons already discussed with respect to the 23(a) prerequisites of commonality and typicality: the same legal theory underlies all class members' claims, and those issues predominate over any minor factual damage questions. <u>See, e.g.</u>, <u>Central States Southeast v. Merck-Medco Managed Care, LLC</u>, 433 F.3d 181, 190 (2d Cir. 2005) ("Even where there are some individualized damages issues, common issues may predominate when liability can be determined on a class-wide basis") (internal quotation and citation omitted). Further, the magnitude of damaged-based differences is lessened in the settlement context, where the methodology for evaluating individual claims has been essentially standardized in the agreed upon plan of allocation.

The superiority of a class action "to other available methods for fairly and efficiently adjudicating the controversy" is established when, as here, "[t]he potential class members are both significant in number and geographically dispersed," <u>Cromer Finance Ltd. v. Berger</u>, 205 F.R.D. 113, 133 (S.D.N.Y. 2001) (Cote, J.), and when "[t]he interest of the class as a whole in litigating the many common questions substantially outweighs any interests by any individual

8

member in bringing and prosecuting separate actions." Id. Especially for the purposes of settling a securities fraud action, the superiority of the class action here to any other mode of adjudication is beyond question. Indeed, the signature *raisons d'etre* of the class action device exist here: (i) the injured number more than 14,000 yet the size of each individual's loss (according to plaintiffs' expert, somewhere between fifteen and thirty-two cents per share) is unlikely to motivate any one shareholder to seek redress under the federal securities laws, and (ii) only a class-wide settlement could secure defendants a class-wide release–often an indispensable component of a corporate defendant's incentive to settle.

## II. Approval of Class Action Settlement

This Court may approve a proposal that binds class members only "after a hearing and on finding that it is fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2). The controlling principles in this Circuit are well established; as recently summarized by Judge Lynch of the Southern District,

> [T]he determination that a settlement is worthy of approval is within the discretion of the district court. As a general policy matter, federal courts favor settlement, especially in complex and large-scale disputes, so as to encourage compromise and conserve judicial and private resources. Accordingly, this Court will take into consideration such public policy concerns in exercising its discretion. While acknowledging the policy considerations that favor settlement, the Court " must eschew any rubber stamp approval in favor of an independent evaluation" of the settlement. The Court "has a 'fiduciary' duty to the non-representative class members who were not party to the settlement agreement because '[i]nherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members.'" Unlike "typical adversary litigation," where the Court sits "as an umpire," in this situation the Court "sits also as a guardian for class members who have not received a notice or who lack the intellectual or financial resources to press objections." Although the Court must make its own independent evaluation of the settlement, the Court must also assess the settlement as it stands, without modifying its terms, and without substituting its "business judgment for that of counsel, absent evidence of fraud or overreaching."

9

In re Global Crossing, 225 F.R.D. at 455 (internal citations omitted).

In evaluating whether the settlement is substantively "fair, reasonable and adequate" within the meaning of Rule 23(e)(2), courts in the Second Circuit apply the familiar Grinnell factors. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds*, Goldberger, 209 F.3d at 43. The somewhat overlapping factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation.

Grinnell, 495 F.2d at 463 (internal citations omitted). While Grinnell makes clear that courts are not to "rubber stamp" a settlement, Grinnell also specifically cautions courts to "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." Id. at 462.

The Grinnell fairness analysis of the settlement's *terms*, however, proceeds through the wider lens of the negotiating process leading up to the settlement, D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001), for the Court must first and foremost satisfy itself that the settlement was not the product of collusion. Joel A. v. Giuliani, 218 F.3d 182, 138-39 (2d Cir. 2000). Absent any indication of such collusion, a presumption of fairness, adequacy and reasonableness may arise as long as there were arm's-length negotiations between experienced counsel. Wal-Mart Stores, Inc. v. Visa USA, Inc., 396 F.3d 96, 116 (2d Cir.), cert. denied, 544 U.S. 1044 (2005).

The parties, through counsel, have appeared before this Court on several occasions prior

to the Fairness Hearing last week, and as a result of the Court's acquaintance with counsel on those occasions, the Court's careful review of the substantial briefing on the motion to dismiss decided last year, the representations of both plantiffs' and defendants' counsel at the Fairness Hearing, along with the detailed assertions of plaintiffs' counsel in their declarations submitted on the present motions, the Court is more than satisfied that collusion had no role in the settlement. To the contrary, the parties, apparently at the urging of one or more of the insurance carriers involved, submitted their dispute to mediation before retired Judge Politan, whose active role in the negotiations strongly supports a finding here, as it has in other actions,[2] that negotiations were conducted at arm's-length.

The Court finds, therefore, that a presumption of reasonableness, fairness and adequacy attaches to the settlement it has been asked to approve. Plaintiffs' brief commendably addresses all nine Grinnell factors in detail—and neither the Court nor counsel for defendants' takes issue with that analysis—but the presumption of fairness lessens the need for the Court to discuss each factor individually. Cf. Thompson v. Metropolitan Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003). (courts are to "consider the totality of these [Grinnell] factors in light of the particular circumstances" and need not find that every factor supports approval of the settlement). Also militating against a less exacting factor-by-factor Grinnell examination are the realities of the case: as the parties made quite clear at the Fairness Hearing, the settlement was entirely a business decision, both sides having determined that the cost of pursuing the dispute to final

---

[2] *See, e.g., In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 465 (S.D.N.Y. 2004) (noting participating of retired Judge Politan in the settlement process); *In re Elan Sec. Litig.*, 385 F. Supp.2d 363, 369 (S.D.N.Y. 2005) (same); *In re IPO Sec. Litig.*, 226 F.R.D. 186, 194 n.42 (S.D.N.Y. 2005) (same)

judgment outweighed any compromise in their position reflected in the settlement figure. As the Court remarked at the Fairness Hearing, due to the costs of discovery that have long-fueled predictions of discovery reform, the Court has observed first-hand that "so many of these cases seem to be going away as a matter of business judgment. . . [and that the parties] "are business people [who] make business judgements." Tr. at 10-11. Now, as at the hearing, the Court "considerably understand[s] the inclination by both sides of the aisle to resolve it." Tr. at 11.

In any event, independent of any presumption, the Court is satisfied that plaintiffs' counsel have obtained a fair and adequate settlement for the class. John C. Hammerslough, an expert in market impact, materiality and damages, has opined that in a hypothetical perfect victory on all issues of liability, the class could recover $10.4 million. See *Hammerslough Affidavit, April 20, 2010*, Exh. B. to Joint Declaration. If Hammerslough's figures are accurate or even nearly so, the settlement amount of $2.9 million would represent a recovery rate in the area of 28%—unquestionably, a good settlement.

Mr. Hammerslough's curriculum vitae details significant experience in this area and, not surprisingly, he has received defendants' endorsement (through their silence). Upon its own careful study as well, the Court finds that Mr. Hammerslough's analysis carries the general ring of intuitive and objective correctness—allowing, of course, for some margin of embellishment or oversimplification in Hammerslough's stated principles, estimates and actual calculations.

The least exact aspect of Hammerslough's analysis, by even plaintiffs' counsel's admission, ventures to estimate the differing percentages of individual and institutional injured shareholders who would in fact file claims and proceeds to conclude that, despite a theoretical perfect recovery of $10.4 million, it was realistic to expect that only $3.2 million worth of claims

would in fact be filed. By that projection, the settlement sum of $2.9 million reflects a recovery rate of over 90% and, in counsel's words, is not only "good" but "extraordinary." The Court does not accede to these rather extreme-sounding assertions, but it also need not find that the settlement was extraordinary. Rule 23(e) requires that the settlement be fair, reasonable and adequate, and the Court concludes that it is. The $2.9 million cash settlement will provide tangible, certain relief to the class without subjecting them to the risks and expense of protracted litigation. Indeed, one of the settlement's greatest virtues, not accounted for in Hammerslough's analysis, is its arrival at a relatively early stage of the litigation. Less than five months to the day from this Court's decision denying the motion to dismiss, the parties were in mediation before Judge Politan, and only a little more than a year after that decision they are here with a fully ironed out set of agreements.

## III. The Application for Attorneys' Fees and Reimbursement of Costs

Plaintiffs' counsel seek an award of $965,000, which would be 33.25% of the gross settlement award, to be paid out of common settlement fund. The Second Circuit in Goldberger, made clear that "both the lodestar and the percentage of fund methods are available to district judges in calculating attorneys' fees in common fund cases," 209 F.3d at 50, and plaintiffs' counsel have addressed both methodologies in their submissions. Relying on authorities finding that the percentage of fund method is increasingly preferred, and that 33% of the common fund is considered routine and therefore reasonable, plaintiffs' counsel also offer the lodestar method "as a cross-check." Mem. in Support of Attorneys' Fees at 3. Relying on their time sheets and hourly rates, counsel argue that the $965,000 fee award they seek is reasonable because it represents only 84.5% of their actual time billed to the prosecution of this case (or, in other

13

words, "a negative multiplier" of the actual lodestar of $1,141,294.15). Mem. in Support at 3.

In ruling upon the fee application, the Court adheres closely to the teachings of the Second Circuit in Goldberger. The most basic of starting principles, not unique to Goldberger but reaffirmed there, are, first, that "the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances," second, that "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court," and third, whether electing the percentage of fund or lodestar method, "district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee." Goldberger, 209 F.3d at 47, 50 (internal citation omitted). These "traditional criteria" include "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Id. at 50 (internal citation omitted).

More crucially, Goldberger goes to substantial lengths to encourage caution, moderation and searching scrutiny. First, the Court flatly rejects the proposition that 25% of the recovery, whether calculated through a lodestar or as a straight percentage, is an established benchmark in common fund fees. Id. at 51. To the contrary, the Court is "disturbed by the essential notion of a benchmark." Accepting that lawyers who successfully prosecute class actions deserve reasonable compensation and that market rates are the appropriate proxy for their compensation, the Court was concerned that "we cannot know precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." Id. at 52.

Indeed, for similar reasons, the Second Circuit cautions district courts not to overvalue

14

the absence of class member objection, a factor on which counsel here place significant reliance. Id. at 53. As the Circuit reasons, class members "rarely object" to the proposed fees outlined in a notice of pendency, and "[w]hy should they? They have no real incentive to mount a challenge that would result in only a 'minuscule' pro rata gain from a fee reduction." Id. (internal citation omitted). Likewise, the Circuit's opinion also calls into question the "the substantial contingency risk" that fee applicants in common fund cases typically claim to have borne, citing "an empirical study [that] has concluded that 'there appears to be *no appreciable risk* of non-recovery' in securities class actions, because 'virtually all cases are settled.'" Id. at 52 (internal citation omitted) (emphasis added by Second Circuit).

In sum, Goldberger (i) urges district courts to avoid any "substitute for the searching assessment that should be . . . performed in each case," (ii) teaches that "a fee award should be based on scrutiny of the unique circumstances of each case, and 'a jealous regard to the rights of those who are interested in the fun," and (iii) declares "[its] overarching concern for moderation." Id. at 52, 53 (internal citations omitted).

After carefully reviewing the entire record of proceedings in this action, the Court concludes that a fee award of the size requested by plaintiffs' counsel would be inconsistent with the guiding principles announced in Goldberger. Certainly there's been a job exceedingly well done, and the Court extends its compliments to counsel on both sides for having made the sound legal judgments that forged the settlement and for having done so at such an early stage in the litigation.

But several factors militate in favor of a modest reduction in the fee award. First, despite counsel's easy assertion that a matter is complex because it sounds in securities fraud, counsel as

15

seasoned and experienced in the field as plaintiffs' must know that this case was not especially complex. At bottom, as reflected in the Court's decision denying the motion to dismiss, the case was about Arotech's alleged failure to disclose that the government's termination of its contract with Arotech's subsidiary Armour of America was a termination "for default"—and little else. Second, the efficacy of the pleadings and briefs was disproportionate to their prolixity; indeed, as the Court's decision denying the motion to dismiss sought to convey tactfully, plaintiff's pleadings and the bulk of plaintiffs' extensive briefings nearly eclipsed the most critical feature of the case, and the one upon which this Court's decision to deny the motion to dismiss rested. See, e.g., Arotech, 608 F. Supp. 2d at 383 ("As the Court understands it, the gravamen of plaintiffs' claim, which emerged in its most succinct iteration in plaintiffs' supplemental (and final) written submission and at oral argument. . . is that defendants never disclosed the TD4.") Third, and somewhat paradoxically, one of the settlement's most laudatory features—its occurrence early, before the labor-intensive phases of summary judgment motion practice or pre-trial preparation—also militates against the size of the requested award.

For all of these reasons, and guided by Goldberger, the Court, in its discretion, concludes that a modest downward adjustment in the requested fee is more appropriate than the full sum requested, and grants plaintiffs' counsel an award of $725,000, reflecting 25% of the gross settlement fund, to be paid out of that fund. On the subject of reimbursement for expenses, the Court is satisfied that the requested amount of $45, 346.32 is justified, reasonable and fair.

## CONCLUSION

The Court finds that the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure have been satisfied, that the requirements of Rule 23(b)(3), including notice, have also

been satisfied, and finally certifies for settlement purposes a (b)(3) class as previously approved in the earlier provisional rulings. The Court also concludes that the $2.9 million cash settlement and plan of allocation as defined in settlement papers are fair, reasonable and adequate within the meaning of Rule 23(e), and directs the class members, named plaintiffs and defendants to consummate the settlement in accordance with its terms and provisions as detailed in the settlement documents. The plan of allocation is likewise approved as fair and reasonable, and plaintiffs' counsel and the claims administrator are directed to administer the stipulation in accordance with its terms and provisions. Finally, the Court awards plaintiffs' attorneys' fees in the amount of $725,000 and reimbursement of their expenses in the amount of $45,346.32, to be disbursed from the gross settlement fund.

The discussion in this Memorandum and Order largely supplanting the summary findings and extraneous language contained in the proposed "Order and Final Judgment" submitted by plaintiffs, the parties are hereby directed to submit a revised proposed final judgment, vastly abridged, consistent herewith.

SO ORDERED.

Dated: Brooklyn, New York
June 4, 2010

s/ Judge Raymond J. Dearie

_____
RAYMOND J. DEARIE
United States District Judge